**PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, et al., Plaintiffs,**

v.

**MERRILL LYNCH & CO., INC., et al., Defendants.**

No. 08 Civ. 10841 (JSR).

United States District Court, S.D. New York.

Aug. 22, 2011.

David R. Stickney, David A. Thorpe, Timothy Alan Delange, Bernstein Litowitz Berger & Grossmann LLP, Jarrett Scott Charo, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Gerald H. Silk, David Lloyd Wales, Jeroen Van Kwawegen, Sean K. O'Dowd, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, Samuel Howard Rudman, Carolina Cecilia Torres, David Avi Rosenfeld, Mario Alba, Jr., Robbins Geller Rudman & Dowd LLP, Melville, NY, Anthony D. Phillips, Nicole Catherine Lavallee, Berman Devalerio, San Francisco, CA, Norman Berman, Scott A. Mays, Berman Devalerio, Boston, MA, John Anthony Kehoe, Kessler Topaz Meltzer & Check, LLP, Radnor, PA, for Plaintiffs.

Carla R. Walworth, Mor Wetzler, William Albert Novomisle, Paul Hastings LLP, Jay B. Kasner, Christopher P. Malloy, Scott D. Musoff, Skadden, Arps, Slate, Meagher & Flom LLP, Mitchell A. Lowenthal, Cleary Gottlieb Steen & Hamilton, LLP, Steven Cooper, Kristina Marie Mentone, Reed Smith, Adam N. Zurofsky, Floyd Abrams, Sarah Penny Windle, Tammy Lynn Roy, Cahill Gordon & Reindel LLP, Joshua M. Rubins, Satterlee Stephens Burke & Burke LLP, New York, NY, James E. Anklam, James D. Wareham, DLA Piper US LLP, Washington, DC, for Defendants.

## OPINION AND ORDER

JED S. RAKOFF, District Judge.

This securities action is a consolidation of four cases involving claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o, in connection with defendants' sale of mortgage pass-through certificates by means of documents that allegedly contained untrue statements and material omissions. On March 23, 2011, lead plaintiff the Mississippi Public Employees' Retirement System and additional named plaintiffs the Los Angeles County Employees Retirement Association, the Wyoming State Treasurer, the Connecticut Carpenters Pension Fund, and the Connecticut Carpenters Annuity Fund (collectively, "Plaintiffs") moved for an order certifying the action as a class action on behalf of all persons or entities who purchased or otherwise acquired the certificates in 18 separate offerings during the period of February 2006 through September 2007 and were damaged thereby.[1] Plaintiffs also moved for an order appointing Plaintiffs as class representatives with Bernstein Litowitz Berger & Grossmann LLP as class counsel.

Defendants Merrill Lynch & Co., Inc. ("Merrill"), Merrill Lynch Mortgage Investors, Inc. (the "Merrill Depositor"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch PFS"), Matthew Whalen, Paul Park, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi and Donald C. Han (collectively, "Defendants") opposed the motion on the ground that Plaintiffs had failed to establish the requirements for class certification as set forth in Rule 23 of the Federal Rules of Civil Procedure. In particular, they argued that "critical issues concerning the existence and materiality of the alleged misstatements/omissions, loss causation, the expiration of the limitations period, and Plaintiffs' knowledge of the alleged mis-

---

1. Specifically, Plaintiffs moved for an order certifying the following proposed class:

 All persons or entities who purchased or otherwise acquired Merrill Lynch Alternative Note Asset Trust Series 2007–A3, 2007–AF1, 2007–F1, Merrill Lynch First Franklin Mortgage Loan Trust Series 2007–2, 2007–3, 2007–4, 2007–A, Merrill Lynch Mortgage Investors Trust Series 2006–MLN1, 2006–FM1, 2006–FF1, 2006–RM5, MLCC 2006–2, 2006–AHL1, 2006–RM3, 2006–WMC1, 2006–WMC2, 2006–A1, Ownit Mortgage Loan Trust Series 2006–2

 and who were damaged thereby. Excluded from the Class are Defendants and their respective officers, affiliates and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. *See* Notice of Motion for Class Certification and Appointment of Class Representatives and Class Counsel. The dates corresponding to the listed offerings are February 2006 through September 2007.

statements ... cannot be proved by generalized proof common to all class members." *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Defs.' Opp'n") at 10. They maintained, therefore, that Plaintiffs had failed to show that questions of law or fact common to the class as a whole would predominate over questions affecting only individual class members.

On June 15, 2011, after careful consideration of the parties' voluminous written submissions and lengthy oral arguments, the Court issued an Order granting Plaintiffs' motion for class certification. This Opinion sets forth the reasons for the Court's decision. In brief, the Court concludes that Plaintiffs have satisfied all of the requirements for class certification under Rules 23(a) and 23(b)(3). As courts have repeatedly found, suits alleging violations of the securities laws, particularly those brought pursuant to Sections 11 and 12(a)(2), are especially amenable to class action resolution. *See, e.g., Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. 267 (S.D.N.Y.2003). The instant action depends, more than anything else, on establishing that certain statements and omissions common to all the offerings were material misrepresentations: a classic basis for a class action. Moreover, the potential defenses to liability in this case, to the extent they are viable at all, can largely be resolved through generalized proof. Finally, the class action approach to this case promises an enormous savings in judicial resources. Accordingly, the Court reaffirms its June 15, 2011 Order in all respects.

### PROCEDURAL HISTORY

As explained in detail in this Court's prior Opinions and Orders in this case,[2] with which full familiarity is here presumed, the first of the four cases here consolidated was filed by plaintiffs Connecticut Carpenters Pension Fund and Connecticut Carpenters Annuity Fund (collectively "Connecticut Carpenters")[3] on December 5, 2008. The other three cases were filed by Iron Workers Local No. 25 Pension Fund ("Iron Workers"),[4] Public Employees' Retirement System of Mississippi ("MissPERS"),[5] and Wyoming State Treasurer[6] on December 12, 2008, February 17, 2009, and March 27, 2009 respectively. On April 23, 2009, the Court selected MissPERS as lead plaintiff. *See Iron Workers Local No. 25 Pension Fund v. Credit–Based Asset Servicing and Securiti-*

---

2. *See Iron Workers Local No. 25 Pension Fund v. Credit–Based Asset Servicing and Securitization, LLC,* 616 F.Supp.2d 461 (2009); *Pub. Emples. Ret. Sys. v. Merrill Lynch & Co.,* 714 F.Supp.2d 475 (S.D.N.Y.2010); *Public Emples. Ret. Sys. of Miss. v. Merrill Lynch & Co.,* 2010 WL 4903619, 2010 U.S. Dist. LEXIS 127211 (S.D.N.Y. Nov. 30, 2010).

3. Specifically, plaintiff Connecticut Carpenters consists of two Taft–Hartley pension fund systems that purchased Series 2006–2 Certificates issued by Ownit Mortgage Loan Trust. *See* Plaintiffs' Memorandum of Law in Support of Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Pls.' Mem.") at 7. *Id.*

4. Iron Workers Local No. 25 Pension Fund is a Taft–Hartley pension fund with approximately 4,000 participants and $622 million in assets. *See* Amended Class Action Complaint for Violation of §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Amended Complaint") ¶ 14. Iron Workers purchased certificates issued by the C–BASS 2007–CB4 Trust. *Id.*

5. Lead Plaintiff, MissPERS, is a governmental defined benefit pension plan for nearly all non-federal public employees in the State of Mississippi. Pls.' Mem. at 6. MissPERS provides benefits to over 75,000 retirees and future benefits to more than 250,000 current and former public employees. *Id.* MissPERS purchased Series 2007–A Certificates issued by the Merrill Lynch First Franklin Mortgage Loan Trust, Series MLCC 2006–2 and 2006–A1 Certificates issued by the Merrill Lynch Mortgage Investors Trust, and Series 2007–F1 Certificates issued by the Merrill Lynch Alternative Note Asset Trust. *Id.* at 6–7.

6. Plaintiff Wyoming manages and invests all funds of the State of Wyoming (with the exception of the State Retirement Fund). *See* Pls.' Mem. at 7. Wyoming currently manages over $10 billion in non-pension funds. *Id.* Wyoming purchased Series 2006–WMC1, 2006–A1, 2006–WMC2, 2006–AHL1, 2006–MLN1, 2006–RM3, 2006–FM1, and 2006–RM5 Certificates issued by Merrill Lynch Mortgage Investors Trust, as well as Series 2007–2, 2007–3, and 2007–4 Certificates issued by Merrill Lynch First Franklin Mortgage Loan Trust. *Id.*

zation, LLC, 616 F.Supp.2d 461 (2009). After the cases were consolidated under the Iron Workers docket number (08 Civ. 10841), a consolidated Class Action Complaint was filed on May 20, 2009 using that same docket number but altering the order of the parties in the caption and naming the Los Angeles County Employees Retirement Association as an additional plaintiff.[7] See Pub. Emples. Ret. Sys. v. Merrill Lynch & Co., 714 F.Supp.2d 475, 478 (S.D.N.Y.2010).

On June 17, 2009, all defendants named in the consolidated Class Action Complaint filed motions to dismiss. As relevant to the instant proceedings, the Court's Opinion and Orders resolving those motions significantly narrowed the scope of this litigation. The Court held, for example, that the named plaintiffs had standing to sue only with respect to those offerings in which they themselves had purchased securities. See Pub. Emples. Ret. Sys. v. Merrill Lynch & Co., 714 F.Supp.2d 475, 480–81 (S.D.N.Y.2010). Accordingly, the Court dismissed, with prejudice, all claims based on the other offerings at issue in the original complaint. Id. The Court also dismissed with prejudice plaintiffs' claims against various rating agencies; plaintiffs' Section 11 claims against three defendants who were alleged to have acted only as "sponsors" of the offerings;[8] and plaintiffs' Section 15 claim against Merrill Lynch, Pierce, Fenner & Smith Inc. Id. at 481–86. Additionally, the Court dismissed several claims without prejudice and granted plaintiffs one more opportunity to adequately plead the asserted violations. Id. The Court explicitly denied, however, defendants' mo-

tion to dismiss on the basis of statute of limitations. Id. at 479–80.

On July 6, 2010, plaintiffs filed an Amended Class Action Complaint ("Amended Complaint") in which they reasserted the surviving claims and attempted to replead most of the claims the Court had previously dismissed without prejudice.[9] The remaining defendants again moved to dismiss, and another full round of briefing and argument followed. On November 8, 2010, the Court issued an Order dismissing the claims asserted against J.P. Morgan Securities, Inc. and ABN AMRO, and therefore, as to all defendants, the claims relating to the offerings in which those defendants were involved. See Public Emples. Ret. Sys. of Miss. v. Merrill Lynch & Co., 2010 WL 4903619, at *3, 2010 U.S. Dist. LEXIS 127211, at *11 (S.D.N.Y. Nov. 30, 2010). The Court also dismissed plaintiff Iron Workers from the case. See id. The Court otherwise denied the motions and expressly reserved decision on the question of whether appraisals constitute false statements of fact.

### AMENDED COMPLAINT

The surviving claims in the Amended Complaint may be summarized briefly as follows. As noted above, Plaintiffs contend that they purchased mortgage pass-through certificates ("Certificates") from defendants in 18 separate offerings during the period of February 2006 through September 2007. Defs.' Mem. at 1. Mortgage pass-through certificates are securities entitling the holder to income payments from pools of loans and/or

---

**7.** Plaintiff LACERA administers defined retirement plan benefits for the employees of Los Angeles County and participating agencies. Pl. Pls.' Mem. at 7. As of June 30, 2008, LACERA had 158,000 members, including more than 52,000 benefit recipients, and maintained over $38 billion in net assets. Id. LACERA purchased Series 2006–WMC2, 2006–A1, and 2006–FF1 Certificates issued by Merrill Lynch Mortgage Investors Trust, as well as Series 2007–A3 and 2007–AF1 Certificates issued by Merrill Lynch Alternative Note Asset Trust. Id.

**8.** Specifically, these claims were dismissed with respect to Credit–Based Asset Servicing and Securitization LLC ("C–BASS"), First Franklin Financial Corporation ("First Franklin"), and Merrill Lynch Mortgage Lending, Inc. (the "Merrill

Sponsor"). Pub. Emples. Ret. Sys. v. Merrill Lynch & Co., 714 F.Supp.2d 475, 485–86 (S.D.N.Y.2010).

**9.** Plaintiffs did not attempt to re-plead several of the claims dismissed without prejudice, however, and those claims were consequently dismissed. Those claims were: (1) that Merrill was liable as an underwriter for the purpose of Section 11 liability; (2) that the "Junior Underwriters" committed violations of Section 12(a)(2); and (3) that the individual defendants had "control person liability" pursuant to Section 15. See Public Emples. Ret. Sys. of Miss. v. Merrill Lynch & Co., 2010 WL 4903619, at *1 n. 4, 2010 U.S. Dist. LEXIS 127211, at *5 n. 4 (S.D.N.Y. Nov. 30, 2010).

asset-backed or mortgage-backed securities. Am. Compl. ¶ 4. The value of the Certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default. *Id.* For each offering, the "sponsor"—in this case, Merrill Lynch Lending, Inc. (the "Merrill Sponsor") and First Franklin Financial Corporation ("First Franklin")—either originated the loans, or, in most cases, purchased them from one or more loan originators.[10] *See* Am. Compl. ¶ 5; *Public Emples. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 2010 WL 4903619, *1–2, 2010 U.S. Dist. LEXIS 127211, *6–7 (S.D.N.Y. Nov. 30, 2010). The sponsor transferred the loans to the "depositor," in this case Merrill Lynch Mortgage Investors, Inc. (the "Merrill Depositor"), which deposited the loans into the issuing trust. *Public Emples. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 2010 WL 4903619, at *1, 2010 U.S. Dist. LEXIS 127211, at *7. The issuing trust, in turn, sold the certificates to underwriters for sale to investors. *Id.* The remaining underwriter defendant in this case is Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch PFS"). Am. Compl. ¶ 24.

The Merrill Depositor registered the Certificates pursuant to three shelf registration statements filed with the Securities and Exchange Commission ("SEC") on August 5, 2005, December 21, 2005, and February 2, 2007, respectively. *Public Emples. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 2010 WL 4903619, at *2, 2010 U.S. Dist. LEXIS 127211, at *8. Individual defendants Matthew Whalen, Paul Park, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi, and Donald C. Han were the officers or directors of Merrill Depositor who signed these allegedly false registration statements. Am. Compl. ¶¶ 25–31. The three registration statements, together with the prospectuses and prospectus supplements presented with each offering, are collectively referred to as

the "Offering Documents." *See* Am. Compl. ¶ 1 n. 1.

Plaintiffs generally allege that "[these] Offering Documents contained untrue statements of material fact, or omitted to state material facts necessary to make the statements therein not misleading, regarding: (1) the underwriting standards purportedly used in connection with the origination of the underlying mortgages; (2) the maximum loan-to-value ratios used to qualify borrowers; (3) the appraisals of the properties underlying the mortgages; (4) the debt-to-income ratios permitted on the loans; and (5) the ratings of the Certificates." Am. Compl. ¶ 7. Plaintiffs allege that, "[a]s a result of these untrue statements and omissions in the Offering Documents, Plaintiffs and the Class purchased Certificates that were far riskier than represented and that were not of the 'best quality,' or even 'medium credit quality' and were not equivalent to other investments with the same credit ratings." *Id.* ¶ 9.

These alleged material omissions and untrue statements form the basis of the remaining twenty counts pled in the Amended Complaint. Counts I–VI and VIII–XIX plead violations of Section 11 against the Merrill Depositor, Merrill PFS, and the Individual Defendants.[11] Count XX alleges that Merrill PFS violated Section 12(a)(2). Count XXI alleges that Merrill is liable as a "control person" pursuant to Section 15.

### CLASS CERTIFICATION STANDARDS

Against this background, the Court turns to Plaintiffs' motion for class certification. To qualify for class certification, Plaintiffs must first prove that the class action meets the four requirements of Rule 23(a). Rule 23(a) provides that class members may sue as class representatives only if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the

---

10. The mortgage originators in this case include Countrywide Home Loans, Inc., American Home Mortgage Corp., Ownit Mortgage Solutions, Inc., New Century Mortgage Corporation, IndyMac Bank, F.S.B., WMC Mortgage Corporation, ResMAE Mortgage Corporation, and Fremont Investment & Loan. Am. Compl. ¶ 5.

11. Count VII has been dismissed from the case. *See Public Emples. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 2010 WL 4903619, 2010 U.S. Dist. LEXIS 127211 (S.D.N.Y. Nov. 30, 2010).

representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P.R. 23(a). Second, the proposed class must also satisfy at least one of the three requirements listed in Rule 23(b). In this case, Plaintiffs seek certification of the class pursuant to Rule 23(b)(3), which is satisfied when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P.R. 23(b)(3).

■ Plaintiffs bear the burden of proving that they meet the requirements of Rule 23 by a preponderance of the evidence, *Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 201–03 (2d Cir.2008), and a court must conduct a "rigorous analysis" to determine that the requirements have been satisfied, *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The Second Circuit has set forth the following standards, among others, to govern class certification:

(1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4)

in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*Miles v. Merrill Lynch & Co. (In re Initial Pub. Offerings Sec. Litig.)*, 471 F.3d 24, 41 (2d Cir.2006). The district court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Id.*[12]

### *RULE 23(a)*

#### *Numerosity*

■ Addressing these requirements in turn, the Court first concludes that Plaintiffs have clearly satisfied the numerosity requirement of Rule 23(a). Certification is appropriate when "the number of class members is sufficiently large so that joinder of all members would make litigation needlessly complicated and inefficient." *Banyai v. Mazur*, 205 F.R.D. 160, 163 (S.D.N.Y.2002). In this Circuit, "numerosity is presumed at a level of 40 members," *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995), although the "[d]etermination of practicability depends on all the circumstances surrounding the case, not on mere numbers." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir.1993). "Relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Id.*

**12.** *See also Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc. We recognized in *Falcon* that 'sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' 457 U.S., at 160, 102 S.Ct. 2364, 72 L.Ed.2d 740, and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied,' *id.*, at 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 ....").

In this case, Plaintiffs have demonstrated that, "using a conservative method of counting investors based on currently available discovery, there are at least 1,600 unique investors who purchased or otherwise acquired Certificates in the 18 Offerings." Pls.' Mem. at 10 (citing Report of Joseph R. Mason, dated March 22, 2011 ("Mason Report") ¶ 95).[13] Further, "each Offering has at least 40 distinct investors—except for the MANA Series 2007–3 Offering, which has, at a minimum, 36 distinct investors and likely many more." *Id.* (citing Mason Report ¶ 95). *See, e.g., New Castle v. Yonkers Contracting Co.,* 131 F.R.D. 38, 41 (S.D.N.Y.1990) (certifying class with 36 potential members). Plaintiffs have also produced evidence that the investors are geographically dispersed institutions and individuals with a wide range in the size of transactions, from 10,000 units to hundreds of millions units. Pls.' Mem. at 11 (citing Mason Report ¶ 97). This evidence is plainly sufficient to satisfy the numerosity requirement of Rule 23(a).

Defendants' main argument to the contrary, that numerosity is not satisfied because many of the potential class members are sophisticated investors, is without merit. Although the class certainly includes sophisticated institutional investors, individual investors also purchased the mortgage-backed securities at issue. *See* Mason Report ¶ 89. Moreover, as the express language of Rule 23(a)(1) indicates, numerosity is satisfied if "the joinder of all members is impracticable," and this may be the situation even in cases where all the investors are sophisticated. For example, in a case involving 100 investors, all of whom were sophisticated, it would typically be impractical either to conduct 100 separate trials or to join 100 investors, each

separately represented, in a single trial, and hence numerosity would be satisfied.[14]

*Commonality*

▮ The second requirement under Rule 23(a) is that the action must raise "questions of law or fact common to the class." Fed.R.Civ.P.R. 23(a)(2). Defendants failed to address this issue in either their written submissions or in oral argument before the Court, presumably relying instead on their contention that questions of law or fact common to class members do not *predominate* over questions affecting only individual members. *See* Fed.R.Civ.P. Rule 23(b)(3). Their strategic decision in this regard is not surprising given that courts in this Circuit have held that the Rule 23 commonality requirement is "plainly satisfied [where] the alleged misrepresentations in the prospectus relate to all the investors, [as the] existence and materiality of such misrepresentations obviously present important common issues." *Korn v. Franchard Corp.,* 456 F.2d 1206, 1210 (2d Cir.1972). *See also In re IPO Sec. Litig.,* 243 F.R.D. 79, 85 (S.D.N.Y. 2007); *In re Prestige Brands Holdings, Inc. Securities Litigation,* No. 05 Civ. 6924(CLB), 2007 WL 2585088, at *2 (S.D.N.Y. Sept. 5, 2007). Even a single common question of law or fact may suffice to satisfy the commonality requirement, *see Marisol A. by Forbes v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997), and in this case the common questions include, most prominently, whether Defendants made materially false and misleading statements in the Offering Documents in any or all of the ways alleged in the Amended Complaint.

However, in their petition for leave to appeal from the class action decision in this

**13.** In connection with their reply papers, Plaintiffs submitted a "Numerosity Update to Expert Report of Joseph R. Mason." *See* Declaration of David L. Wales in Further Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, dated April 29, 2011, Ex. 14. In that report, Dr. Mason states that his estimate of the "cumulative number of investors has risen and now exceeds 1,800." *Id.* Under either the original or the revised estimate, however, the numerosity requirement is clearly satisfied.

**14.** Additionally, as Judge Baer recently pointed out in one of the main cases relied upon by the Defendants, this argument is unavailing "in light of recent precedent finding no problem with numerosity where five of the 76 purported class members had suffered approximately 80% of the total alleged losses." *N.J. Carpenters Health Fund v. Residential Capital, LLC,* 272 F.R.D. 160, 163–64 (S.D.N.Y.2011) (citing *Bd. of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,* 269 F.R.D. 340, 342 (S.D.N.Y.2010)).

case,[15] Defendants do rely on the Supreme Court's decision *Wal–Mart Stores, Inc. v. Dukes*—issued five days after this Court rendered its "bottom-line" ruling granting class certification in this case—that at least the dissenting justices read as heightening the standard for satisfying the commonality requirement under Rule 23(a). *See Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2561–62, 180 L.Ed.2d 374 (2011) (Ginsburg, J., concurring in part and dissenting in part) ("The Court . . . disqualifies the class at the starting gate, holding that the plaintiffs cannot cross the 'commonality' line .set by Rule 23(a)(2). In so ruling, the Court imports into the Rule 23(a) determination concerns properly addressed in a Rule 23(b)(3) assessment."). In *Wal–Mart,* the Supreme Court emphasized that plaintiffs cannot satisfy the commonality requirement merely by alleging violations of the same provision of law. *Id.* at 2550–51. Instead, plaintiff's complaint must allege a "common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551. In other words, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 132 (2009) (emphasis in original)).

However, the Supreme Court's clarifying language in *Wal–Mart* has no effect on the commonality determination in this case. The common questions presented by this case—essentially, whether the Offering Documents were false or misleading in one or more respects—are clearly susceptible to common answers. Moreover, as explained in detail below, not only do common questions exist in this case, but they in fact predominate over

any questions affecting only individual members. *See Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002) (the predominance inquiry is a more demanding criterion than the commonality inquiry). Furthermore, the facts in *Wal–Mart,* a case in which three named plaintiffs sought to represent a class of 1.5 million women in an employment discrimination suit, are entirely distinguishable from the facts of the instant securities class action. Accordingly, the Court finds that *Wal–Mart* has little to no bearing on the issues before the Court and certainly does not change its June 15, 2011 ruling in any respect.

*Typicality*

▆▆▆▆ The third and fourth requirements of Rule 23(a) tend to merge with the commonality requirement, as all three "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 158 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The typicality requirement is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 35 (2d Cir.2009). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani,* 987 F.2d 931, 936–37 (2d Cir.1993). *See also National Auto Brokers Corp. v. General Motors Corp.,* 60 F.R.D. 476, 486–87 (S.D.N.Y. 1973) ("[T]he primary criterion [for determining typicality] is the forth-rightness and vigor with which the representative party can

---

**15.** *See generally* Defendants–Petitioners' Petition Pursuant to Federal Rule of Civil Procedure Rule 23(f) for Leave to Appeal from an Order Granting Class Certification. Since the Court issued only a "bottom-line" ruling on June 15, Defendants felt obliged to petition for leave to appeal *without* having the benefit of the Court's reasoning, as now set forth in this Opinion. However, defendants furnished the Court with their petition, which the Court has therefore considered in reaffirming here its prior ruling.

be expected to assert the interests of the members of the class."). Courts in this Circuit have held that the "typicality requirement is not demanding." *In re Prestige Brands Holdings, Inc.,* No. 05 Civ. 6924(CLB), 2007 WL 2585088, *2–3, 2007 U.S. Dist. LEXIS 66199, *10–11 (S.D.N.Y. 2007) (internal quotation marks omitted).

The Court previously held that Plaintiffs have standing to pursue claims only with respect to those offerings in which they purchased Certificates. *See Pub. Emples. Ret. Sys. v. Merrill Lynch & Co.,* 714 F.Supp.2d 475, 480–81 (S.D.N.Y.2010). The Class is defined to include only those "persons or entities who purchased or otherwise acquired" Certificates in each of the 18 Offerings purchased by the Plaintiffs. *See* Pls.' Mem. at 1. Accordingly, the claims of each class member arise from the same course of events, namely, the events giving rise to the issuance of the Offering Documents in connection with the 18 relevant Offerings, and the same allegedly misleading statements made in each of those Offering Documents. It is clear, therefore, that Plaintiffs "have the incentive to prove all of the elements of the causes of action which would be presented by the individual members of the class were they initiating individual actions." *In re NASDAQ Market–Makers Antitrust Litigation,* 172 F.R.D. 119, 126 (S.D.N.Y.1997) (citation omitted).

Defendants argue, however, that Plaintiffs cannot establish typicality because their claims are subject to unique defenses. *See* Defs.' Opp'n at 30; *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.N.Y. 1990) ("While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.") (internal citations omit-

ted).[16] In particular, they argue: (1) that Wyoming and MissPERS lack standing to sue with respect to certain Certificates that have purportedly matured and have been paid in full because they have suffered no cognizable injury; (2) that none of the named plaintiffs has standing to sue on the tranches they did not purchase; (3) that Wyoming's claim on the MLMI 2006–WMC1 offering is barred by the three-year statute of repose applicable to Section 11 claims; and (4) that each of the named Plaintiffs' claims is uniquely subject to the statute of limitations defense. *Id.* at 30–32.

The first argument is unavailing for several reasons. As an initial matter, Plaintiffs dispute whether certain Certificates were subsequently sold or paid in full. Further, on inspection it appears that this dispute is not about standing at all, but about competing general theories of damages. Section 11(e), which provides the measure of damages for violations of Section 11(a), states that "[t]he suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought...." 15 U.S.C. § 77k(e). In this case, Plaintiffs have sufficiently demonstrated for Rule 23(c) purposes that the Certificates were no longer marketable at anywhere near the prices paid by Plaintiffs at the time of the suit. *See* Am. Compl. ¶¶ 9, 208–09.[17]

**16.** *But cf. In re Colonial Partnership Litig.,* 1993 U.S. Dist. LEXIS 10884, 1993 WL 306526 at *4 (D.Conn.1993) ("On the other hand, where absent class members will not suffer, the fact that a 'representative party may be barred from recovery by defenses peculiar to him which would not

bar other members' need not in itself defeat certification.").

**17.** *See also* Plaintiffs' Opposition to: (1) The Merrill Lynch Defendants' and Individual Defendants' Motion to Dismiss the Amended Com-

Virtually all the Certificates that were originally rated "AAA" were subsequently downgraded below investment grade, and the delinquency, foreclosure and bank ownership rates on the underlying mortgages have greatly increased since issuance. *Id.* These facts are sufficient to show injury under the statute.

As recent precedent confirms, Defendants' argument that Plaintiffs must show that they failed to receive principal or interest payments—*see* Memorandum of Law in Support of the Motion of the Merrill Lynch and Defendants and Individual Defendants to Dismiss the Amended Class Action Complaint—constitutes "too cramped a reading of damages":

> Since Plaintiff does not allege that it failed to receive any principal or interest payments due under its Certificates, Defendants argue that Plaintiff failed to allege a cognizable injury. The alleged injury–79% diminution of market value-is said to be immaterial in the context of mortgage-backed securities Certificates. Plaintiff might suffer a loss from the impairment of cash flow, but loss of value is not a cognizable loss. This is too cramped a reading of damages.
>
> Many fixed-income debt securities, such as corporate bonds do not trade on national exchanges and yet institutional investors routinely purchase corporate bonds hoping to realize a profit through resale. Plaintiff may have purchased the Certificates expecting to resell them, making market value the critical valuation marker for Plaintiff. This is a securities claim, not a breach of contract case. Mortgage-backed Certificates are a type of security, which is why, in fact, the SEC has adopted a regulatory scheme relating to pooled asset-backed securities: 17 C.F.R. § 229.1111. At this stage all that may be said is Plaintiff's market value allegations are sufficient. *See In re Countrywide Financial Corp. Sec. Litig.,* 588 F.Supp.2d 1132, 1169–70 (C.D.Cal.2008).

*New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.,* No. 08 Civ 5653

(PAC), 2010 WL 1473288, at *5 (S.D.N.Y. Mar. 29, 2010).

■■■ Moreover, even if Wyoming and MissPERS were unable to recover damages with respect to certain Certificates, this would be insufficient to preclude a finding of typicality. "[I]t is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Seijas v. Republic of Arg.,* 606 F.3d 53, 58 (2d Cir.2010). *See also N.J. Carpenters Health Fund v. Residential Capital, LLC,* 272 F.R.D. 160, 165 (S.D.N.Y.2011) ("Even if, as Defendants claim, many putative class members suffered no injury, such an infirmity would not defeat typicality in light of the fact that a showing of the 'typicality requirement is not demanding.' ") (citation omitted).

Defendants' second argument is also without merit. Defendants cite no case for the proposition that standing must be determined on a tranche-by-tranche basis. Moreover, the representations in each Offering apply equally to all tranches within that Offering. Pls.' Mem. at 6 (citing Mason Report ¶ 6 ("all the securities in an offering are interrelated and untrue statements and material omissions in the Offering Documents similarly affect the securities in each offering.")). "While investors' repayment rights may vary slightly based on the seniority of the tranches they purchased, this does not present a 'fundamental' conflict within the class." *In re Dynex Capital, Inc. Sec. Litig.,* No. 05 Civ. 1897(HB), 2011 WL 781215, at *2 (S.D.N.Y. Mar. 7, 2011). *See also N.J. Carpenters Health Fund v. Residential Capital, LLC,* 272 F.R.D. 160, 166 (S.D.N.Y.2011) ("The question whether the offering documents were materially misleading will be answered the same way regardless of the varying knowledge levels, risk levels, and loss levels of purchasers of different tranches.") *Id.* at 166. Indeed, because of the "waterfall" method of repaying investors in order of the quality of security purchased, false statements in Offering Documents affect all Certificates in the Offering. *See* Plaintiffs' Reply Memorandum of Law in Further Support

---

plaint; and (2) ABN AMRO, Inc. and J.P. Morgan Securities, Inc.'s Motion to Dismiss the

Amended Complaint, dated August 20, 2010, at p. 11.

of Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Pls.' Reply") Pl. at 14.

As to Defendants' third argument regarding, the statute of repose, Plaintiffs point out that claims relating to the 2006–WMC1 Certificates were first included in a complaint on December 5, 2008, less than three years after the February 10, 2006 offering. *See* Pls.' Reply at 9. The statute of repose was tolled as of this date. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F.Supp.2d 429, 455 & n. 19 (S.D.N.Y.2005) ("In *American Pipe & Construction Co. v. Utah*, the Supreme Court held that the filing of a class action suit tolls the applicable limitations period for each class member. 414 U.S. 538, 552–53, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); *see also Korwek v. Hunt*, 827 F.2d 874, 876–77 (2d Cir.1987). The Supreme Court noted that a contrary rule would undermine the policies of efficiency and economy of litigation underlying Fed.R.Civ.P. 23 . . . .") (internal quotation marks omitted).

Defendants' fourth argument regarding the statute of limitations will be discussed in detail below in connection with the predominance requirement. Briefly stated, the question of whether class members were on inquiry notice of the conduct alleged in the Amended Complaint more than a year before the filing of the cases consolidated herein will be subject of generalized proof.

■■■ Finally, as a global matter, Plaintiffs are not required, in proving typicality, to show that the situations of the named representatives and the class members are identical. *See In re NASDAQ Market–Makers Antitrust Litigation*, 172 F.R.D. 119, 126 (S.D.N.Y.1997); *see also In re Marsh & McLennan Cos. Inc. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009) ("Factual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not

destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct"). It bears repeating that the relevant inquiry with respect to typicality is whether "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir.2009). "As long as plaintiffs assert, as they do here, that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish [the] necessary typicality." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 72–73 (S.D.N.Y.2009) (citations omitted). Under these standards, the Court finds that Plaintiffs have readily satisfied the typicality requirement.

### Adequacy

■■■ The final requirement of Rule 23(a) is that the class representatives "will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). "Adequacy entails inquiry as to whether: 1) plaintiffs' interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir.2009) (internal quotation marks omitted). A finding that a proposed class representative satisfies the typicality inquiry constitutes "strong evidence that [its] interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiff['s] claims will vindicate those of the class." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 158 (S.D.N.Y.2008). *See also Dura–Bilt v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y.1981) ("The typicality prerequisite overlaps with the common question requirement of Rule 23(a)(2) and the adequate representation requirement of Rule 23(a)(4).").[18]

---

**18.** *See also Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) ("We have previously stated in this context that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether un-

der the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore

The Court finds that Plaintiffs satisfy the adequacy requirement for largely the same reasons they satisfy the typicality requirement. Plaintiffs' interests are directly aligned with the interests of all the class members, who collectively purchased Certificates in each of the Offerings pursuant to the same material untrue statements and omissions in the Offering Documents. *See Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071(HB), 2003 WL 21672085, at *3 (S.D.N.Y. July 16, 2003) (finding proposed class representative adequate where the complaint alleged "a common course of conduct and unitary legal theory for the entire class period—that is, Defendants issued prospectuses and registration statements that contained false statements about the Trust's NAV, because the loans were not properly valued and were not marked to market when they should have been."). In particular, potential differences in damages are not dispositive in the class certification analysis. *See Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir.2010).

It is also beyond serious dispute that class counsel—Bernstein Litowitz Berger & Grossmann LLP—is qualified and capable of prosecuting this action. *See* Declaration of David L. Wales, dated March 22, 2011 ("Wales Decl."), Ex. 8 (firm resume detailing over 25 years of experience in prosecuting securities fraud class actions). Indeed, the Court finds that Plaintiffs have ably prosecuted this action for over two years.

Defendants argue, however, that "MissPERS's relationship with Lead Counsel calls into question MissPERS's suitability as a class representative." Defs.' Opp'n at 33 (citing *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 155–56 (S.D.N.Y.2010) (class certification should be denied "when a class representative is closely associated with class counsel" because "he or she may permit a settlement less favorable to the interests of absent class members.") (citation omitted)). Defendants also contend that the Mississippi Attorney

General, Jim Hood, "has been widely criticized for 'pay-for-play' arrangements with (*inter alios*) Lead Counsel." Defs.' Opp'n at 33 (citing Exs. 58–62).

While the Court is hardly oblivious to such concerns, *see Iron Workers Local No. 25 Pension Fund v. Credit–Based Asset Servicing & Securitization, LLC*, 616 F.Supp.2d 461, 467 n. 3 (S.D.N.Y.2009), Defendants' belatedly-raised [19] insinuations are not only hopelessly vague but also entirely unpersuasive in the context of the instant litigation. The notion that the allegedly close relationship between Plaintiffs' lead counsel and the Attorney General of the State of Mississippi will, in some uncertain manner, cause plaintiffs' counsel to enter into a settlement in this case "less favorable to absent class members" is belied, not only by its inherent improbability, but also by the high level of professionalism and diligence on the part of plaintiffs' lead counsel already amply demonstrated to the Court over two years' of litigation. It also ignores this Court's own history of independently inquiring in depth into any settlement before approving it. The Court is fully satisfied that the class representatives, and their counsel, will fairly and adequately protect the interests of the entire class.

### *RULE 23(b)(3)*

#### *Predominance*

 Having found that Plaintiffs have satisfied the requirements of Rule 23(a), the Court now turns to the question most vigorously disputed by the Defendants: whether Plaintiffs have satisfied the requirements of Rule 23(b)(3). Rule 23(b)(3) provides that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P.R. 23(b)(3). "Class-wide issues predomi-

---

also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.' *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157–158, n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).'').

19. Since it has been clear from the outset that Bernstein Litowitz sought to represent the entire class in this case, Defendants could have raised this alleged conflict of interest long ago.

nate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir.2010). While the predominance inquiry is more demanding than the commonality determination required by Rule 23(a), predominance does not require a plaintiff to show that there are *no* individual issues. *In re NYSE Specialists Securities Litigation*, 260 F.R.D. 55, 75 (S.D.N.Y.2009). Indeed, "individual issues will likely arise in this case as in all class action cases," and to allow "various secondary issues of plaintiffs' claim[s] to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws." *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y.1981).

Defendants argue that predominance is not met here because this action will require the Court to consider, *inter alia:* whether each individual investor knew of the alleged misstatements at the time of its purchases and whether the statements were material to this investor; whether and when each purchaser had or should have discovered sufficient information to trigger the one-year limitations period under the Securities Act; whether certain investors must prove reliance, and if so, whether they in fact relied on the alleged misrepresentations; whether there was a causal link between the alleged misrepresentations and the alleged losses; and how much loss each investor in fact suffered. Defendants contend that answering each of these questions will require an examination of various individualized issues. *See* Defs.' Opp'n at 10–28.

An analysis of Defendants' arguments must begin with the provisions of the relevant statutes.[20] Section 11 of the Securities Act provides for a cause of action by the purchaser of the registered security against a defendant who (1) signed the statement at issue; (2) was a director, person performing similar functions, or partner in the issuer at the time the statement was issued; (3) was named in the statement, with that party's consent, as being or about to become a director, person performing similar functions, or partner; (4) was an expert whose involvement was, with that party's consent, listed in the statement; or (5) was a statutory underwriter of the security. 15 U.S.C. § 77k(a)(1)–(5). To state a claim under Section 11, the plaintiff must allege that: "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.' " *Lindsay v. Morgan Stanley (In re Morgan Stanley Info. Fund Sec. Litig.)*, 592 F.3d 347, 358–59 (2d Cir.2010) (quoting 15 U.S.C. § 77k(a)).

Section 12(a)(2) provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or omissions. *Id.* at 359. "Whereas the reach of section 11 is expressly limited to specific offering participants, the list of potential defendants in a section 12(a)(2) case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement." *Id.* Accordingly, "[t]he elements of a *prima facie* claim under section 12(a)(2) are: (1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.' " *Id.* (alterations in original) (citing 15 U.S.C. § 77l(a)(2)).

---

**20.** *See In re WorldCom, Inc. Securities Litigation,* 219 F.R.D. 267, 288 (S.D.N.Y.2003) ("The plaintiffs have shown that the many common legal and factual issues at stake in this litigation will predominate even when the arguments raised by the defendants in this connection are carefully considered. A description of the statutes and their elements illustrates why the common questions will overwhelm the proof and legal issues at trial.")

Liability under these provisions is strict but limited in scope. As recently summarized by the Second Circuit:

> Claims under sections 11 and 12(a)(2) are therefore Securities Act siblings with roughly parallel elements, notable both for the limitations on their scope as well as the *in terrorem* nature of the liability they create. *See Pinter [v. Dahl]*, 486 U.S. [622,] at 646 [108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)]; *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 & n. 12 (1983). Issuers are subject to "virtually absolute" liability under section 11, while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence. *Huddleston*, 459 U.S. at 382, 103 S.Ct. 683. Moreover, unlike securities fraud claims pursuant to section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.*, plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation. *See Rombach*, 355 F.3d at 169 n. 4. Thus, in contrast to their "'catchall'" cousin in the Exchange Act—section 10(b), 15 U.S.C. § 77j(b)—sections 11 and 12(a)(2) of the Securities Act apply more narrowly but give rise to liability more readily.

*Lindsay v. Morgan Stanley (In re Morgan Stanley Info. Fund Sec. Litig.)*, 592 F.3d 347, 359–360 (2d Cir.2010).[21]

Section 15, in turn, creates liability for "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under Sections 77k [Section 11] or 77*l* [Section 12] of this title...." 15 U.S.C. § 77*o*(a). Accordingly, liability under Section 15 is derivative of liability under Sections 11 and 12(a)(2). A "control person" under Section 15 must have "the power, directly or indirectly, 'to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *In re Deutsche Telekom AG Sec. Litig.*, No. 00 CIV 9475 SHS, 2002 WL 244597, at *6, 2002 U.S. Dist. LEXIS 2627, at *18 (S.D.N.Y. Feb. 20, 2002) (quoting 17 C.F.R. § 230.405).

Liability under these provisions, however, is subject to certain qualifications and defenses. Notwithstanding the general rule that a Section 11 claimant need not prove reliance, reliance must be shown if the plaintiff "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least 12 months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a).[22] *See also In re World-Com, Inc. Securities Litigation*, 219 F.R.D. 267, 288 (S.D.N.Y.2003). Additionally, while an issuer's liability under section 11 is absolute, "it can assert a defense that the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security." *Miles v. Merrill Lynch & Co. (In re Initial*

---

**21.** *See also Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement. The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements.") (footnotes omitted). *See also Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*, 483 F.3d 70, 73 n. 1 (2d Cir.2007); *Rombach v. Chang*, 355 F.3d 164, 169 n. 4 (2d Cir.2004).

**22.** "If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the securities relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person." 15 U.S.C. § 77k(a)(5).

*Pub. Offering Sec. Litig.)*, 483 F.3d 70, 73 n. 1 (2d Cir.2007) (internal quotation marks omitted). There is also an affirmative defense to a Section 11 claim allowing a defendant to prove that the loss in the value of a security is due to something other than the alleged misrepresentation or omission. *See* Section 11(e), 15 U.S.C. § 77k(e).[23] A defendant's burden in establishing this defense is heavy since "the risk of uncertainty" is allocated to defendants. *Akerman v. Oryx Communications, Inc.*, 810 F.2d 336, 341 (2d Cir.1987). Similarly, there is an affirmative defense to a Section 12(a)(2) claim that prohibits recovery to the extent that "the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communications, with respect to which liability of that person is asserted...." 15 U.S.C. § 77*l*(b).

With these principles in mind, the Court turns to Defendants' arguments regarding the predominance requirement of Rule 23(b)(3). Defendants first contend that determining whether the Offering Documents in fact contained material misstatements or omissions will require an examination of various individualized issues. They argue, for example, that the supplements to the 18 prospectuses did not contain the same statements and that the various Offerings were backed by loans issued by different originators using varied underwriting guidelines and exceptions. Def. Opp'n at 25 (citing Sanders Rep. ¶¶ 29–47). They further note that "each prospectus supplement was issued at a different point during a 17–month period from February 2006 to September 2007, while the mortgage finance market was undergoing dramatic changes." *Id.* Defendants argue that because of these "material variations in the nature of the misrepresentations made to each member of the proposed class," the falsity of the alleged misrepresentations must be determined on an individual basis.

*Id.* (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir.2002)).

Defendants' arguments grossly overstate the differences. While an analysis of the alleged falsity of the statements in the Offering Documents will of course entail some individualized inquiry, the common issues here overwhelm the individual ones. To begin with, as demonstrated in Plaintiffs' moving papers, "[e]ach of the Certificates purchased by the Plaintiffs and the Class were created and issued pursuant to [the] same process by the same Defendants." Pls.' Mem. at 5. The alleged flaws common to that process, which resulted in the misstatements, will be the subject of common proof. Even more fundamentally, not only the prospectuses proper but also the supplements purporting to describe the loans and the underwriting standards contain substantially similar, boilerplate language across the Offerings. For example, the relevant prospective supplements describing the Countrywide Home Loans' underwriting standards state:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income") ratios are within acceptable limits.

Am. Compl. ¶ 62. Similarly, the Prospectus Supplements describing First Franklin's underwriting standards made the following representations:

---

**23.** Section 11(e) provides "[t]hat if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable." 15 U.S.C. § 77k(e).

First Franklin Financial's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The standards established by First Franklin Financial require that mortgage loans of a type similar to the Mortgage Loans be underwritten by First Franklin Financial with a view toward the resale of the mortgage loans in the secondary mortgage market. In accordance with First Franklin Financial's underwriting guidelines, First Franklin Financial considers, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio ("Debt Ratio"), as well as the value, type and use of the mortgaged property.

Am. Compl. ¶ 103. Although the Supplements contain some statements that are unique to the particular offering, it is the substantially similar statements common to each Prospectus and Supplement that are the clear focus of the Amended Complaint.

Defendants' related argument, that individual issues regarding materiality will predominate, can be swiftly rejected. The definition of materiality under Sections 11 and 12(a)(2) is whether "the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rombach v. Chang*, 355 F.3d 164, 172 n. 7 (2d Cir.2004). "The materiality of a statement is measured in terms of its market impact, and does not vary among similarly situated investors." *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 94 (S.D.N.Y.1981). Because materiality is determined by an objective rather than a subjective standard, the question of materiality, "rather than being an individual issue, is in fact a common issue." *Id.* This is true even if, as seems doubtful, a misstatement that is material at the time of one offering is no longer material at the time of another offering, for this would still need to be determined by common evidence as to the objective state of affairs at a given time.

A bit more tricky is Defendants' next argument: that Plaintiffs have not established the predominance requirement because this case involves individualized issues of reliance. As noted above, although reliance is generally presumed for claims pursuant to Sections 11, the presumption of reliance does not apply where the plaintiff "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least 12 months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a). In this case, Defendants argue that the proposed class includes investors who purchased Certificates more than a year after the relevant initial offerings. Def. Opp'n at 24. They argue that "Plaintiff Wyoming, for example, purchased Certificates in MLMI 2006–WMC1 on April 2, 2007; MLMI 2006–WMC2 on June 24, 2008; and MLMI 2006–Al on April 29, 2008 all more than a year after the prospectus supplements for those offerings became effective (respectively, on February 10, 2006, March 28, 2006, and March 29, 2006), and after more than 12 monthly distribution reports became available to holders for those offerings." *Id.* Similarly, they argue that LACERA purchased MLMI 2006–Al Certificates on June 8, 2007, again more than a year after the March 29, 2006 offering. *Id.* According to Defendants, "Investors like LACERA and Wyoming would, thus, have to prove individual reliance on the alleged misstatements in the prospectus supplements." *Id.*

But the factual premise of Defendants' argument is flawed. "[D]istribution reports" issued on Form 10–D are not equivalent to "earnings statement[s]" for the purposes of 15 U.S.C. § 77k(a). An "earning statement" must consist of one, or any combination of, the following corporate reports: Forms 10–K, 10–Q, 8–K, 20–F, 40–F, 6–K or in the annual report pursuant to Rule 14a–3 of the Exchange Act. 17 C.F.R. § 230.158(a)(2)(i)–(ii). These corporate reports differ fundamentally from Form 10–D because the disclosure required of operating companies is more rigorous than that required of mortgage-backed securities. Also, unlike a corporation, the loan pools are static, and there is, therefore, no corporate earnings statement concerning the corporation's assets, revenues, and earnings. Moreover, the question of whether a corporate earnings report

serves as an earning statement depends on its compliance with SEC rules and regulations governing disclosure. *See In re World-Com, Inc. Sec. Litig.*, 219 F.R.D. 267, 293 (S.D.N.Y.2003) (finding that a report or statement that violates SEC rules and regulations is not considered an "earning statement" for Section 11 purposes).

Tellingly, Defendants cite no case in support of their argument, which was in fact recently rejected in *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781(HB), 08 CV 5093(HB), 2011 WL 2020260, at *6, 2011 U.S. Dist. LEXIS 46066, at *29–30 (S.D.N.Y. Apr. 28, 2011).[24] The same impediments also defeat Defendants' arguments regarding prospectus supplements as would-be earnings statements. Accordingly, the Court finds that Plaintiffs are not required to plead reliance in this case.[25]

Defendants' next arguments, which relate to Defendants' potential defenses rather than Plaintiffs' prima facie case of liability, ultimately concern Plaintiffs' purported knowledge of Defendants' alleged misdeeds. One such argument is that individual issues regarding the statute of limitations will predominate because "there is every reason to believe that many (or all) of the putative class members' claims are time-barred." Defs.' Opp'n at 19. Under Section 13 of the Securities Act, claims under Sections 11 or 12(a)(2) are subject to a one-year statute of limitations, which begins to run upon "the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Defendants appear to contend that the claims of various class members are barred under both the first clause (so-called "actual notice") and the second clause (so-called "inquiry notice") of this provision.

The Court previously addressed Defendants' "inquiry notice" argument in its June 1, 2010 Opinion. The Court there explained that Plaintiffs are held to be on "inquiry notice" of an untrue statement or omission when "circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Staehr v. The Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 411 (2d Cir.2008) (quoting *Dodds v. Cigna Sec.*, 12 F.3d 346, 350 (2d Cir.1993)). In response to Defendants' contentions that such inquiry notice arose a year before the filing of the first of the cases here consolidated, the Court held:

> [W]hile defendants have proffered substantial evidence that prior to December 2007, let alone prior to March 27, 2008, questions about the bona fides of mortgage-backed securities were the subject of news reports, government investigations, public hearings, and civil complaints, plaintiffs argue that virtually none of this evidence references Merrill or the certificates at issue here and that statements made by the defendants in contemporaneous and subsequent documents would reasonably have had the effect of reassuring an investor that the doubts raised about other companies' offerings were not applicable here. *See* Pl. Opp. to Merrill Defs. et al. at 65–68, ECF No. 81. Tellingly, the certificates at issue were not downgraded below investment grade until April 2008, that is, after the March 27, 2008 limitation date, and, even then, the downgrade was not

---

**24.** *See N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781(HB), 08 CV 5093(HB), 2011 WL 2020260, at *6, 2011 U.S. Dist. LEXIS 46066, at *29–30 (S.D.N.Y. Apr. 28, 2011). ("Harborview Defendants argue that a number of 'Distribution Summaries' they released are the equivalent of an 'earning statement' and triggered a requirement to plead reliance. Their argument is unpersuasive because the regulations that define 'earning statement' are specific and do not appear to contemplate the kind of Distribution Summaries at issue here. *See* 17 C.F.R. 230.158. Nor can Harborview Defendants point to any judicial decision finding

that Distribution Summaries such as those here are adequate stand-ins.").

**25.** Even if reliance were at issue, however, the Court is persuaded by the decision in *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 294 (S.D.N.Y.2003) that the reasons behind the creation of the "fraud on the market" presumption for securities fraud claims, pursuant to which all traders who purchase stock in an efficient market are presumed to have relied on the accuracy of a company's public statements, would apply with equal force to the Section 11 claims brought here.

premised on the discovery of fraud but only on a perceived increase in risk.

*Pub. Emples. Ret. Sys. v. Merrill Lynch & Co.*, 714 F.Supp.2d 475, 479–80 (S.D.N.Y. 2010). The Court therefore denied Defendants' motion to dismiss on ground that Plaintiffs' claims were time-barred.

The facts upon which the Court based its decision have not changed. As the Court previously found, none of Plaintiffs' Certificates was downgraded below investment grade prior to April 24, 2008, and the last of the consolidated lawsuits was filed within one year of that date. *See* Pls.' Reply at 2, 8 (citing Declaration of David L. Wales, dated April 29, 2011, Ex. 10). While Defendants cite to generic news reports regarding the mortgage-backed securities market, these reports do not directly focus on the Certificates here at issue. *See, e.g.,* Defs.' Opp'n at 19. *See also In re NovaGold Res. Inc. Sec. Litig.*, 629 F.Supp.2d 272, 285 (S.D.N.Y.2009) ("To trigger the duty of inquiry, the storm warnings must 'relate directly' to the misrepresentations and omissions on which the plaintiffs base their claims . . . ."). Accordingly, for the purposes of assessing class certification, the Court rejects Defendants' claim that Plaintiffs, or indeed any potential class members, were on inquiry notice of the violations alleged in the Amended Complaint.

Additionally, and more fundamentally, inquiry notice is assessed under an objective standard and evaluated under a totality-of-the-circumstances test. *See Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 427 (2d Cir.2008); *In re Novagold Res. Inc. Sec. Litig.*, 629 F.Supp.2d 272, 285 (S.D.N.Y. 2009). It is therefore beyond cavil that resolution of this question "can be achieved through generalized proof." *UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir.2010). If the news reports, government investigations, public hearings, and civil complaints attached as exhibits to Defendants' moving papers were sufficient, either singly or in combination, to place a reasonable investor on inquiry notice of Defendants' alleged securities violations, then the claims of all class members are time-barred. This is the very definition of generalized proof.

Defendants also argue, however, that certain Plaintiffs and class members had actual knowledge of the conduct alleged in the Amended Complaint, either at the time of purchase or, at worst, more than a year prior to the filing of the four cases here consolidated. It was because of differences like this that Judge Baer, in *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160 (S.D.N.Y.2011), although rejecting many of the arguments similar to those made by defendants here, ultimately denied class certification.

In this case, Defendants contend that "tens, and perhaps hundreds of thousands of individuals here must have known of the conduct alleged in the Complaint, including employees of the investment banks and originators, as well as the borrowers and loan officers and brokers associated with the 86,576 loans at issue and the army of independent appraisers that appraised the underlying properties." Defs.' Opp'n at 12. They also argue that "the putative class here includes leading players in the MBS markets that had knowledge of the lending practices of mortgage originators and knew about problems with property appraisals, inflated ratings, and loan underwriting practices." *Id.* For example, they note that Fannie Mae, a "quintessential housing market insider" and the single largest proposed class member, purchased close to $5 billion worth of the Certificates. *Id.*

Defendants also note that a substantial portion of the Certificates were purchased through sophisticated money managers. "Plaintiffs, for example, delegated complete discretion over the accounts holding their Certificates to investment advisors such as UBS (Lead Plaintiff), WAMCO (LACERA and Wyoming), Goldman Sachs (LACERA), PIMCO (Wyoming) and J.P. Morgan (Wyoming)." Defs.' Opp'n at 13. Defendants contend that these advisors conducted extensive due diligence, and that "[t]he knowledge of and notice to these advisors is imputed to their clients." *Id.* (citing *Radiation Dynamics, Inc. v. Goldmuntz*, 323 F.Supp. 1097, 1099 (S.D.N.Y.1971)).

Based on these and other arguments—for example, as to what was known about Defen-

dants' practices at different points in time at which various plaintiffs purchased—Defendants argue that individualized inquiries will be required. But even if this were true—and for reasons detailed below this Court is unpersuaded it is true—it does not follow that these individual issues would be sufficient to overcome the predominance of the common issues. Judge Baer's decision, which Defendants cite in their support, is narrowly confined to its own particular facts and the record before that Court (and, in any event, is not binding on this Court). As for Circuit authority, Defendants mainly rely on *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offerings Sec. Litig.)*, 471 F.3d 24 (2d Cir. 2006). In that case, the Second Circuit held that "Plaintiffs' allegations, evidence, and discovery responses demonstrate that the predominance requirement is defeated because common questions of knowledge do not predominate over individual questions. The claim that lack of knowledge is common to the class is thoroughly undermined by the Plaintiffs' own allegations as to how widespread was knowledge of the alleged scheme." *Id.* at 43. However, the Second Circuit prefaced these remarks by emphasizing that "[t]here is no dispute that a *section 10(b)* claimant 'must allege and prove' that the claimant traded 'in ignorance of the fact that the price was affected by the alleged manipulation.'" *Id.* at 43 (emphasis added). Although the Court suggested that "Plaintiffs must show lack of knowledge to recover on their section 11 claims as well," *id.*, it specifically clarified this statement in a subsequent opinion:

> To avoid any misunderstanding with respect to the Petitioners' claims under section 11 of the Securities Act, 15 U.S.C. § 77k, we clarify our reference to these claims, *see Miles*, 471 F.3d at 43, to reflect the general rule that an issuer's liability under section 11 is absolute, but that it can assert a defense that "the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security." IX Louis Loss & Joel Seligman, Securities

Regulation 4258 (3d ed. 2004). "Neither Section 11 nor Section 12(a)(2) requires that plaintiffs allege the scienter or reliance elements of a fraud cause of action." *Rombach v. Chang,* 355 F.3d 164, 169 n. 4 (2d Cir.2004). *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.),* 483 F.3d 70, 73 n. 1 (2d Cir.2007). The Second Circuit's clarification is not trivial in this context, as "[c]ourts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions." *Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 93 (S.D.N.Y.1981).[26] The subsequently-clarified paragraph of *Miles* relied upon by the Defendants is therefore far from dispositive.

In any event, *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offerings Sec. Litig.),* 471 F.3d 24 (2d Cir.2006), is factually distinguishable. In that case, the plaintiffs alleged that defendants had engaged in a scheme to defraud the investing public in violation of federal securities laws. *Id.* at 27. Among other things, they alleged that the underwriter defendants conditioned allocations of shares at the offer price on agreements to purchase shares in the aftermarket (the "Tie-in Agreements"). *Id.* The Court found that knowledge of the scheme was widespread, as "the initial IPO allocants, who were required to purchase in the aftermarket, were fully aware of the obligation that is alleged to have artificially inflated share prices." *Id.* at 43. Indeed, plaintiffs themselves referred to the "industry-wide understanding" that those who agreed to purchase in the aftermarket received allocations. *Id.* Additionally, the proposed class included thousands of investors who were alleged to have actually participated in the fraudulent scheme. *See* 471 F.3d at 43–44; *see also Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.),* 483 F.3d 70, 72–73 (2d Cir.2007) (highlighting the inclusion of scheme participants in the class; expressing no view on the

---

**26.** *See also In re Marsh & McLennan Cos., Inc. Sec. Litig.,* 2009 WL 5178546, at *11 (S.D.N.Y. Dec. 23, 2009) ("Courts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions.") (internal citation omitted).

merits of a narrower class); *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81 (S.D.N.Y.2009) (on remand, certifying the class after participants in the scheme were excluded).

There is no allegation in this case that any class member actually participated in the conduct described in the Amended Complaint. Although Defendants note that some members of the class, including Morgan Stanley Co., have been sued in connection with *their own MBS offerings*, this is irrelevant to the Offerings at issue in this case. Moreover, the evidence in the record that any class member knew of false statements in the Offering before purchase is weak at best. During oral argument, for example, the Court examined Defendants' contention that Wyoming had knowledge of Defendants' alleged conduct because it delegated discretion over its accounts to its investment advisor, Pacific Investment Management Company ("PIMCO"), which in turn *conducted* extensive due diligence on the housing market. However, PIMCO expressly denied knowledge of underwriting violations or inflated appraisal values.[27] The "evidence" relied on by Defendants to the contrary is largely inadmissible hearsay drawn from various news articles and public reports. And even if the Court were to consider the non-evidence proffered by the Defendants, it is far from probative. For example, Defendants note that the head of PIMCO's mortgage desk told the Wall Street Journal in May 2005 that he "assume[d] that appraisals [were] a little lofty." *See* Declaration of Christopher P. Malloy, dated April 15, 2011 ("Malloy Decl."), Ex. 51. This generic statement does not come close to suggesting that

PIMCO had any knowledge of appraisal inflation in the Offering Documents at issue here. *See, e.g., In Re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, Nos. 2:08–md–1919 MJP, C08–387 MJP, 2010 WL 4272567, at *6 (W.D.Wash. Oct. 12 2010) ("[t]hat [plaintiff] thought there was 'froth' in the real estate appraisal market is not the same as [plaintiff] knowing Defendants were engaged in the appraisal manipulation alleged in the complaint."). Similarly, Defendants allege that Paul McCulley, a managing director at PIMCO, told the Financial Crisis Inquiry Commission that PIMCO analysts had conducted "old-fashioned shoe-leather research" and witnessed what he called "the outright degradation of underwriting standards." *See* Malloy Decl. Ex. 56 at 4 (The Financial Crisis Inquiry Report.) Again, this broad indictment of the housing market as a whole does not suggest that PIMCO had knowledge of the conduct alleged in this case.

It is telling that following PIMCO's deposition, Defendants abandoned their deposition notices for Plaintiffs' additional money managers. Wales Decl. ¶ 14. Western Asset Management Company ("WAMCO") also confirmed that it had no actual knowledge of any material false statements in the Offering Documents prior to its purchase of Certificates. *See* Wales Decl. Ex. 8 (Declaration of Travis M. Carr, dated April 29, 2011 ¶ 7 ("I had no actual knowledge, and have no reason to believe that anyone else in Western Asset's structured products group had any actual knowledge of any material false statements in the offering materials regarding the underwriting standards, loan-to-value ratios, reported appraised values, or the appraisal

---

**27.** On April 12, 2011, Richard Fulford, designated by PIMCO to testify on its behalf pursuant to Fed.R.Civ.P. 30(b)(6), testified as follows:

> Q: Now, at any time before PIMCO purchased these certificates that are listed in Exhibit 4, did PIMCO know of any untru statements in the offering documents?
> A: Not that I'm aware of, no. [ . . . ]
> Q: Now, did Pimco have any knowledge before purchasing the certificates that are referenced in Exhibit 4 of violations of the underwriting standards for the loans in the certificates?
> A: No.
> . . .

> Q: Now, did PIMCO know before purchasing the certificates that are listed in Exhibit 4 that the loan-to-value ratios were misrepresented?
> A: No.
> Q: Did PIMCO know before purchasing the securities that the reported appraised values were misrepresented?
> A: No. [ . . . }
> Q: And did PIMCO know that the described process for appraising the properties was misrepresented?
> A: No.

*See* Declaration of David L. Wales, dated April 29, 2011, ¶ 15 (citing deposition of Richard Fulford at 116–21).

process pertaining to the [Certificates]...."")). Defendants' own expert, Anthony Sanders, Ph.D., testified that he was not aware of any evidence that Plaintiffs' money managers knew of false statements in the Offering documents and that, despite an extensive literature search, he found nothing about false statements in connection with the Offerings at issue in this case. Wales Decl. at ¶¶ 19–22.[28]

Defendants' allegations concerning the money managers aside, their contention that "tens, and perhaps hundreds of thousands of individuals here *must have known* of the conduct alleged in the Complaint" is pure speculation. *See* Defs.' Opp'n at 12 (emphasis added). Indeed, Defendants' own expert acknowledged that investors are "not able to assess the risks of poor underwriting and servicing" and that the "securitization market has relied on reps and warranties to protect investors against poor underwriting and loan practices" to address this asymmetry of information. Wales Decl. ¶¶ 12–16.[29] Sheer conjecture that class members "must have" discovered that the "reps and warranties" at issue in this case were in fact false is insufficient to defeat Plaintiff's showing of predominance when there is no admissible evidence to support Defendants' assertions. *See, e.g., In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 134 (S.D.N.Y.2008) ("[B]oth Middlesex and its money manager InTech, which placed all of the class period trades, deny they had any knowledge of the Lie study at the time, ... and Monster has

offered no evidence to the contrary."). Finally, to the extent Defendants argue that actual knowledge can be inferred from the slew of newspaper articles and public reports they have submitted to the Court, this again is an issue subject to generalized proof.

Defendants' final arguments, regarding loss causation and damages, are easily dispensed with. As previously stated, Defendants may assert as an affirmative defense to Plaintiffs' Sections 11 and 12(a)(2) claims that the loss in the value of a securities was due to something other than the alleged misrepresentation or omission. *See* 15 U.S.C. § 77k(e); 15 U.S.C. § 77*l*(b). Leaving aside the fact that it is *Defendants* who must marshal the evidence to support the merits of this defense,[30] loss causation presents a common, not an individual, issue. If the decline in the value of the securities was caused by something other than the alleged misrepresentations or omissions, say, for example, by the general decline in the U.S. securities market, Defendants will be required to rely on generalized proof to support this assertion. With respect to damages, "it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Seijas v. Republic of Arg.*, 606 F.3d 53, 58 (2d Cir.2010). Additionally, Rule 23(c) provides that, "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed.

---

28. Dr. Sanders testified as follows:
 Q: You did an—you said as part of this process you did an extensive literature search for public information.
 A: Yes, literature search.
 Q: And you didn't find any information in that literature search about problems with these Merrill Lynch offerings, did you?
 A: I don't recall seeing that. But let's look for general, general information about the state of the underwriting market, house prices and things like that.
 Q: But as you sit here now you can't recall finding any articles prior, I should say, to the [filing] of the complaint about problems with these certificates, is that correct?
 A: No.
 Q: That is correct?
 A: That is correct. No, I did not see any of these.
 Wales Decl. ¶ 20 (citing Sanders Tr. at 137–38).

29. Dr. Sanders has further stated that "the sudden surge in defaults on the sub-prime mortgages was not predicted by any model I'm aware of and was not anticipated by regulators, banks, investment banks, pension funds, or insurance companies." Wales Decl. ¶ 25.

30. *See, e.g., In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 785–86 (3d Cir.2009) ("In sum, on both the materiality and loss causation fronts, we find the market efficiency issue to be a red herring. The formulaic nature of § 11 leaves defendants with little room to maneuver. Were this a § 10(b) claim, or another claim requiring reliance and proof of loss causation, the efficiency issue might be instructive, if not dispositive. However, where reliance and loss causation are not part of the equation, an individualized inquiry is not required.").

120

R.Civ.P.R. 23(c).[31] The Court may determine at a later point that subclasses are appropriate to manage the allocation of damages, but this decision need not be made at this early stage. In short, Plaintiffs have established predominance under Rule 23(b)(3).

### Superiority

There remains only the question of whether Plaintiffs have also established the second requirement of Rule 23(b)(3), *i.e.*, that class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to such a finding include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed.R.Civ.P.R. 23(b)(3). "In general, securities suits . . . easily satisfy the superiority requirement of Rule 23." *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y.2008). As courts in this District have observed:

> Most violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible. Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be 'fair' nor an adjudication of their claims. Moreover, although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf.

*In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 132 (S.D.N.Y.2008)

(quoting *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y.1999)).

In this case, the Court finds that the factors articulated in Rule 23(b)(3) weigh in favor of a finding of superiority. First, there is no overwhelming interest by class members to proceed individually. To the contrary, "as is the case in most securities suits, multiple lawsuits would be inefficient and costly." *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y.2008). Multiple actions by multiple plaintiffs could also significantly reduce the prospects for recovery as it would decrease plaintiffs' bargaining power. *See Board of Tr. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 355 (S.D.N.Y.2010). Although it is true that the class includes sophisticated institutional investors, the "existence of large individual claims that are sufficient for individual suits is no bar to a class when the advantages of unitary adjudication exist to determine the defendant's liability." *Id.* (quoting 2 Newberg on Class Actions, § 4.29 at 260 (4th ed. 2010)). Moreover, this case involves at least 1,600 individual, geographically dispersed class members, some of whom have suffered losses as small as $2,099.88. Pl. Reply at 11 (citing Wales Decl. Ex. 13, Ex. 14). It is therefore highly unlikely that all or even most of the absent class members would have sufficient resources or economic incentives to fund individual lawsuits, and even if they did, proceeding as a class would still be superior to over 1,600 individual actions. *Id.*

Second it appears that there are only two investors independently pursing Securities Act against Merrill claims regarding the Certificates at issue in this case. *See Allstate et al. v. Merrill Lynch & Co. et al.*, No. 650559/2011, N.Y.Sup.Ct. (Mar. 1, 2011); *Stichting Pensioenfonds ABP v. Merrill Lynch & Co. et al.*, Index No. 651325/2010 (August 19, 2010).[32] The *Allstate* complaint, however, involves only three of the same Offerings at issue here and numerous other certificates not included in this case. *See* Pls.'

---

**31.** *See also In re Playmobil Antitrust Litig.*, 35 F.Supp.2d 231, 249 (E.D.N.Y.1998) ("Rule 23 is flexible in its application. For example, under Rule 23(c)(1), class certification may be altered or amended at any time before a decision on the merits, and Rule 23(d) allows the court to make such orders as are necessary to assure the orderly administration of the proceedings.").

**32.** *See also* Pls.' Reply at 12 n. 8.

Mem. at 24. Nor are the claims in *Stichting Pensioenfonds ABP* interchangeable with those at issue in this case. *See* Malloy Decl. Ex. 40. In any event, the fact that only two investors out of at least 1,600 have filed independent actions weighs in favor of class certification.

Third, it is clearly desirable to concentrate this litigation in this forum. "[C]oncentrating litigation in a single forum plainly has a number of benefits, including eliminating the risk of inconsistent adjudications and promoting the fair and efficient use of the judicial system, and the Southern District of New York is well known to have expertise in securities law." *In re Marsh & McLennan Cos., Inc. Securities Litig.*, No. 04 Civ 8144, 2009 WL 5178546, at *12 (S.D.N.Y. Dec. 23, 2009) (internal quotation marks omitted). Efficiency interests are particularly weighty here given that this action has been ongoing since December 2008 and the Court has already issued three Opinions in this matter.

Finally, "there are no apparent difficulties that are likely to be encountered in the management of this action as a class action apart from those inherent in any hard fought battle where substantial sums are at issue and all active parties are represented by able counsel." *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 134 (S.D.N.Y.2001). To the extent management issues arise, this Court has the ability to "utilize the available case management tools to see that all members of the class are protected, including but not limited to the authority to alter or amend the class certification order pursuant to Rule 23(c)(1)(C), to certify subclasses pursuant to Rule 23(c)(5), and the authority under Rule 23(d) to issue an order ensuring the fair and efficient conduct of the action." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 37 (2d Cir.2009) (internal quotation marks omitted).

Beyond all this, there is a fundamental fact that trying this as a class action, as opposed to multiple individual actions (joinder of which would present its own difficulties), cannot help but result in a huge savings of judicial resources. *See generally Robidoux v. Celani*, 987 F.2d 931 (2d Cir.1993). No one familiar with modern federal dockets can minimize the importance of such savings.

The Court has considered Defendants' additional arguments and finds them without merit. The Court therefore reaffirms its June 15, 2011 Order in all respects. The parties are directed to continue with discovery in accordance with the previously-ordered case management schedule so that this class action may at last be brought to trial.

SO ORDERED.