WIENER, Circuit Judge,
dissenting:
I am compelled to respectfully dissent today by the realization that the panel majority’s opinion will vaccinate illegal pyramid schemes against all civil litigation, immunizing them not just from class actions but ultimately from all judicial challenges. By erecting this barrier to class certification based on nothing more than the theoretical possibility of prior knowledge of illegality, the panel majority creates an insurmountable barrier in this circuit to future class certification of cases that claim the presence of an illegal pyramid scheme. But, even worse, because individuals who are duped into joining such schemes uniformly invest relatively few dollars, none will possibly be able to afford to litigate their individual claims separately. Absent the availability of a class action, there simply will be no possibility of court challenges to such pyramid schemes.
The majority opinion will serve to instruct trial courts in this circuit to deny class certification on the merely theoretical possibility of a class member’s knowledge of the fraud without requiring the defendant to adduce evidence of actual investor knowledge of illegality. Because illegal pyramid schemes are certain to be indistinguishable (to the average consumer) from legal multi-level marketing programs, all such arrangements are likely to present some indication of “illegality.” Thus, defendant schemers will always have some basis to demonstrate possible knowledge of the fraud on the part of potential class members and thereby defeat reliance.
I readily acknowledge that even if a class action were certified here, the defendants might go on to prove that their enterprise is legal and legitimate.[1] But, that will never be known. Absent the availability of a class action such as the one sought in the instant civil RICO suit, no putative prevailing plaintiff will be able to afford to litigate his or her claim individually.[2] The victims of such schemes are never big investors with huge losses (as they usually are in Ponzi schemes). Rather, they are virtually always unsophisticated individuals whose relatively small losses can never justify separate litigation of their claims.[3] Absent the availability of a *160 class action through which to pursue the claims of all similarly situated parties in globo, the founders and operators of illegal pyramid schemes will be totally shielded from civil litigation and thus from civil liability. Here, this means that over 200,-000 plaintiffs will be left entirely without recourse.
At bottom, this appeal requires us to decide whether aspiring class members— allegedly the victims of an allegedly illegal pyramid scheme — can show proximate causation through common evidence sufficient to satisfy Federal Rule of Civil Procedure 23(b)(3)’s predominance requirement at the initial class certification stage. The defendants contend that the district court erred in certifying the plaintiffs’ claim that the defendants induced them to participate in an illegal pyramid scheme by misrepresenting Ignite as a legitimate business opportunity, thereby causing the plaintiffs to suffer monetary losses.
Although the defendants vociferously deny that Ignite is an illegal pyramid scheme, the panel majority selectively cherry picks the factual record to reach the conclusion that it is at least possible that the putative class members had some knowledge that the scheme was illegal. In doing so, the majority allows the defendants to contend that the plaintiffs knowingly participated in the fraud, all the while maintaining that there was none. The majority holds that the mere “possibility” that class members knew of Ignite’s illegality creates individualized issues of reliance sufficient to defeat class certification. I am firmly convinced that, to the contrary, the district court — to which we owe considerable deference — correctly ruled that the plaintiffs can adequately demonstrate proximate causation through common proof, making class certification appropriate. Satisfied that the plaintiffs may rely on a common inference of reliance and that the district court did not err in so holding, I would affirm the district court’s class certification. Here’s why.
I.
We review a district court’s class certification decision under the very deferential abuse of discretion standard “in ‘recognition of the essentially factual basis of the certification inquiry and of the district court’s inherent power to manage and control pending litigation.... Whether the district court applied the correct legal standard in reaching its decision on class certification, however, is a legal question that we review de novo.’ ” [4]
To certify a class, initially the party seeking certification must comply with Federal Rule of Civil Procedure 23. That party must first satisfy Rule 23(a)’s requirements of numerosity, commonality, typicality, and adequacy of representation.[5] Next, that party must satisfy one of Rule 23(b)’s three provisions.[6] Here, the plaintiffs rely on subsection (3) of Rule 23(b), “which requires that questions of law or fact common to the class predominate over questions affecting only individual class members, and that a class action is superi- or to other available methods for the fair and efficient adjudication of the controversy.”[7] The defendants do not dispute the district court’s Rule 23(a) determination and contend only that it erred in finding *161 Rule 23(b)(3)’s predominance requirement met. “Considering whether ‘questions of law or fact common to class members predominate’ begins, of course, with the elements of the underlying cause of action.”[8]
II.
To establish a civil RICO violation here, the plaintiffs must demonstrate proximate causation.[9] Although they need not necessarily prove first-party reliance, the plaintiffs “must establish at least third-party reliance in order to prove causation.”[10] The district court held that the plaintiffs may establish proximate causation through common- proof. First, the district court recognized Ignite’s implicit representation that it is a lawful venture.[11] Second, the district court held that the allegation that the defendants were running an illegal pyramid scheme supports an inference that the plaintiffs chose to participate in the Ignite program only because its illegal nature was hidden from them. Put simply, the plaintiffs could use a common inference that they relied on the implicit misrepresentation that Ignite presented a legitimate business opportunity. In so holding, the district court found that illegal pyramid schemes present a sure loss for the vast majority of participants. The court stated that “[bjecause it can rationally be assumed (at least without contravening evidence) that the legality of the Ignite program was a bedrock assumption of every clas's member, a showing that the program was actually a facially illegal pyramid scheme would provide the necessary proximate cause.” [12] Under this theory, if the plaintiffs are able to prove that Ignite was an illegal pyramid scheme — an element that will undoubtedly be satisfied by common proof — they will also prove both a misrepresentation and proximate causation.
As the district court noted, this theory is far from novel. Indeed, many courts, including the Second, Tenth, and Eleventh Circuits, have recognized that class certification is warranted in this context when proximate causation may be established through a “common sense” inference that the class members’-actions cannot be explained by anything but reliance on the defendants’ conduct.[13] In such cases, *162 courts infer that “members of the plaintiff class relied upon the purported legitimacy of the defendant with which they transacted.” [14]
For example, in CGC Holding Co. v. Broad & Cassel, a class of borrowers sued a group of lenders, claiming that, up front, the lenders fraudulently extracted nonrefundable loan commitment fees from the borrowers for loans that the lenders never intended to provide.[15] There, the plaintiffs sought class certification on the theory “that no rational economic actor would enter into a loan commitment agreement with a party they knew could not or would not fund the loans.”[16] The Tenth Circuit held that “plaintiffs’ payment of up-front fees allows for a reasonable inference that the class members relied on lenders’ promises, which later turned out to be misrepresentations or omissions of financial wherewithal.”[17]
In In re U.S. Foodservice Inc. Pricing Litigation, the Second Circuit upheld class certification in a similar context.[18] There, customers alleged that a food distributor engaged in a fraudulent overbilling scheme by producing inflated invoices, and the district court granted class certification. On appeal, the distributor asserted that individualized issues of reliance should defeat certification. The Second Circuit upheld the class certification, holding that proximate causation could be proved through a generalized inference of reliance:
In cases involving fraudulent overbilling, payment may constitute circumstantial *163 proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice’s implicit representation that the invoiced amount was honestly owed. Fraud claims of this type may thus be appropriate candidates for class certification because “while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue).”[19]
Finally, in Klay v. Humana, Inc., physicians alleged that health maintenance organizations (HMOs) conspired to underpay them for their services.[20] The alleged misrepresentations at issue were the HMOs’ assurance that they would reimburse the physicians for medically necessary services and their provision of explanation of benefits (EOB) forms representing that they paid the physicians the proper amounts.[21] Despite recognizing individualized issues of reliance surrounding the EOB forms, the Eleventh Circuit found no such issues regarding the HMOs’ “antecedent representations about [their] reimbursement practices”:
It does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants’ representations and assumed they would be paid the amounts they were due. A jury could quite reasonably infer that guarantees concerning physician pay — the very consideration upon which those agreements are based — go to the heart of these agreements, and that doctors based their assent upon them.[22]
Rejecting the district court’s analysis and the applicability of this line of cases from other circuits, the majority now holds that the plaintiffs here cannot establish proximate causation through common proof because a few potential class members might have known of Ignite’s illegal nature. Based on that theoretical possibility that a class member might have had actual knowledge of the scheme’s illegality, the majority jumps to the conclusion that individual issues of reliance predominate. In so doing, the majority fundamentally misunderstands — or misrepresents — the nature of pyramid schemes and ignores the absence of evidence, as found by the district court, suggesting that any class member had knowledge of Ignite’s alleged illegality. The majority further errs in assuming that rational economic actors would knowingly participate in an illegal pyramid scheme. This leads to the majority’s stripping these and future plaintiffs of any means to pursue class actions against pyramid schemes in this Circuit. And this, in turn, immunizes such illegal schemes from any judicial challenge because individual losses can never justify solo litigation of such claims.
A.
First, the majority’s conclusion that the class members might have recognized the Ignite program as an illegal pyramid scheme is based on the false premise that such schemes are easily recognizable. A pyramid scheme is
characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other par *164 ticipants into the program rewards which are unrelated to the sale of the product to ultimate users.[23]
But alone possessing these two characteristics does not make a pyramid scheme illegal.[24] Rather, “satisfaction of the second element of the ... test is the sine qua non of a pyramid scheme....”[25] For this reason, in determining a scheme’s legality, careful attention must be paid to whether the program emphasizes recruitment over marketing. Notably, “[n]o clear line separates illegal pyramid schemes from legitimate multilevel marketingprograms; to differentiate the two, regulators evaluate the marketing strategy (e.g., emphasis on recruitment versus sales) and the percent of product sold compared with the percent of commissions granted.”[26] Because illegal pyramid schemes are not easily recognizable and their (temporary) success rests on disguising the scheme, they are “inherently deceptive.”[27] Indeed, “the very reason for [their] per se illegality ... is their inherent deceptiveness and the fact that the futility of the plan is not apparent to the consumer participant.”[28] Further obstructing a superficial judgment on whether a pyramid scheme is in fact illegal is that internal policies, such as those that “deter inventory loading and encourage retail sales,”[29] must be examined closely. Here, the majority assumes that the information necessary to make this determination was available to the class. But, just because an officer of a corporation — never mind its independent contractors or the media — insinuate that something is pyramid-like does not make it illegal.
The majority posits that isolated representations by Ignite could have or should have put class members on notice that they were joining an illegal pyramid scheme. Stated differently, the majority uses the very evidence on which the plaintiffs rely to establish that Ignite is an illegal pyramid scheme to reject a common inference of reliance. Although the record contains isolated representations by Ignite that emphasize recruiting over marketing or even reference the word “pyramid” in relation to Ignite, these random representations fall well short of those that would be necessary to put enough class members on notice that they were joining an illegal pyramid scheme. As courts have long recognized, pyramid schemes are inherently deceptive, and their very success depends on keeping their illegality a secret.
More importantly, the line between a legal “multi-level marketing entity” and an “illegal pyramid scheme” is fuzzy at best. The two are likely indistinguishable to the typical consumer participants or even to the corporate officers themselves. Whether a scheme is illegal is often determinable *165 only after the scheme has failed and extensive litigation. Courts, let alone the typical unsophisticated participants, cannot decide whether or not a scheme is illegal-based only on a handful of isolated representations. Yet this is what the majority has done, and this is the very responsibility with which the majority now charges prospective consumer participants in pyramid schemes: they must immediately recognize a scheme as illegal when faced with divergent representations as to marketing and recruitment. It is simply unrealistic to require unsophisticated consumer participants to be so finely attuned to the intricate mechanics of sophisticated fraudulent schemes and to predict how those schemes will be viewed by regulators and courts.
More concerning to me is the reality that the panel majority’s opinion provides illegal pyramid schemers with a free pass to avoid any court challenge by immunizing them from class actions. The majority allows such schemers to maintain the appearance of legitimacy while injecting just enough suspicion into the consumer marketplace to defeat class certification. Simply warning participants that “if you keep concentrating on customers, you won’t make money,” referring to the scheme as “an octagon, parallelogram, [or] rectangle,” and calling the scheme a “pyramid deal,” will now be sufficient to avoid all litigation and thus all liability. In other words, even if the program otherwise holds itself out as a legitimate business opportunity and even emphasizes, as Ignite did, the importance of marketing over recruiting,[30] isolated intimations of illegality or stray remarks are all that it will take to put prospective consumer participants on notice of the fraud.[31]
*166 B.
Second, even if participants could have reasonably recognized Ignite as an illegal pyramid scheme, I am convinced that the majority errs in rejecting a common inference of proximate causation in the absence of evidence demonstrating that participants had actual knowledge that Ignite was an illegal pyramid scheme. This approach by the majority is inconsistent with our precedent which requires evidence of actual knowledge, not the mere possibility of knowledge. The panel majority approvingly cites Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance,[32] categorizing it as “a case that bears a striking resemblance to this case.” But, the majority ignores a crucial distinction. In Sandwich Chef, .the insureds alleged that the insurers charged premiums in excess of approved rates and misrepresented the correctness of the premiums charged.[33] We rejected class certification because the insureds could not prove proximate causation through common proof. But there, the insurers not only contended- that the insureds “were aware that [the insurance] carriers were chárging them more than the filed rates,” but also “introduced evidence that ... class members individually negotiated with insurers regarding workers’ compensation and insurance premiums.” [34] Thus, “[k]nowledge that invoices charged unlawful rates, ... according to a prior agreement between the insurer and the policyholder, would eliminate reliance and break the chain of causation.”[35]
Unlike in Sandwich Chef, the district court here expressly found that there was no evidence that any class member knew Ignite was an illegal pyramid scheme![36] The district court made this finding after hearing argument and testimony, considering the evidence, reviewing the parties’ submissions, and examining the record. As here we must deferentially review a district court’s factual findings for abuse of discretion, I cannot join the majority in its endeavor to find its own facts without any deference — or recognition that such deference is owed — to the district court’s factual determination.[37]
Reversing the district court’s finding of an absence of evidence of class members’ actual knowledge of the alleged fraud, the panel majority holds that individual issues of reliance predominate based on only a theoretical possibility. Critically, the majority’s approach will preclude a predominance finding in each and every class action fraud case that requires a showing of reliance. Indeed, “if bald speculation that some class members might have knowledge of a misrepresentation were enough to forestall certification, then no fraud allegations of this sort (no matter how uniform *167 the misrepresentation, purposeful the concealment, or evident plaintiffs’ common reliance) could proceed on a class basis” [38]
C.
Third, even assuming that an average prospective participant could have reasonably known that Ignite was an illegal pyramid scheme and that there is evidence of this knowledge, I find the panel majority’s assumption that a rational economic actor would join an illegal pyramid scheme to be unreasonable. The majority hypothesizes that individuals might join illegal pyramid schemes to exploit them because early investors in such schemes just might reap profits from downstream investors. I note initially that the defendants presented no evidence that any class member joined or would have joined the Ignite program in spite of its illegality. The defendants only point to evidence of participants profiting from the scheme, contending that this is enough to indicate that a rational actor would knowingly participate in an illegal pyramid scheme. But this syllogism proves too much. That individuals can profit from illegal pyramid schemes does not necessarily support the conclusion that rational individuals will knowingly participate in illegal pyramid schemes.
More to the point, and as the district court noted, even though class members might have joined Ignite for a vast array of reasons, it flies in the face of reason to conclude that any of these reasons conflict with a universal “bedrock assumption” that Ignite presented a legitimate business opportunity. Simply put, in the face of almost certain losses, illegal pyramid schemes do not present the sort of opportunity in which a reasonably informed rational economic actor would invest. “Rational economic actors do not ordinarily conspire to injure themselves.”[39] The assumption that class members knowingly participated in an illegal pyramid scheme rests on the slender reed that those class members either sought knowingly to become victims or knowingly to become fraudsters. Critically, in illegal pyramid schemes, it is mathematically inevitable that participants will become victims or will victimize others. It goes too far to assume that rational economic incentives motivate individuals to participate in illegal schemes when faced with these options. But this is what the majority holds.
Belying the logic of its approach, the majority analogizes participating in illegal pyramid schemes to gambling. They reason that knowing participation in an illegal pyramid scheme — an investment opportunity in which the vast majority of participants are sure to face losses or to defraud others — is similar to gambling, a recreational (or compulsive) game of chance.[40] *168 Under this analysis, the majority estimates that individuals might choose to participate in illegal pyramid schemes for the same reasons they would choose to gamble: to make money, but also as a form of escape, a casual endeavor, or a hobby. Tellingly, though, the most notable cases in which courts have found a host of additional reasons explaining class members’ conduct involved gambling and the consumer purchase of “light” cigarettes.[41] In Poulos v. Caesars World, Inc., the plaintiff-gamblers alleged that gambling machine manufacturers and casinos misrepresented electronic gambling devices „as presenting true games of chance (like their mechanical counterparts) when, instead, computer programming predetermined individual outcomes.[42] Rejecting class certification, the Ninth Circuit held that individuals choose to gamble for a wide range of reasons, and the fact that a game is truly one of chance is not implicit in every class members’ choice to gamble.[43] In other words, because all class members did not necessarily rely on electronic gaming devices presenting the same odds (or formulating odds in the same manner) as their mechanical counterparts, an individualized showing of reliance was required.[44]
Here, the plaintiffs’ claims would be similar to those raised in Poulos only if they had alleged that Ignite misrepresented some intricacy of, for example, its compensation policy. If that were the case, we could correctly conclude that an alleged misrepresentation of the inner workings of Ignite would not warrant an inference of reliance because such information would likely be irrelevant to most class members’ choice to participate. But that is not the case here: The plaintiffs allege a much more fundamental misrepresentation by the defendants, viz., that Ignite is a legal venture when, instead, it is an illegal pyramid scheme meant to defraud its participants. As other courts have recognized, the choice to participate in a financial transaction does not implicate the same range of possible incentives as does the decision to gamble or to purchase a particular type of cigarette.[45]
Finally, the plaintiffs advance that individuals will not knowingly participate in illegal pyramid schemes because it requires them to defraud those who they recruit, often family and friends. The panel majority rejects this reasoning, suggesting — gratuitously and without record basis — that, like the gambler, participants in *169 pyramid schemes might act at the expense of their family and friends. This analogy is strained at best. Unlike “spending money on gambling,” which, according to the majority, “harms an individual’s family,” a pyramid schemer’s success in this example depends not on expending his or her family’s resources, but, instead, on exploiting his or her family members.
III.
I conclude my dissent where I began: By holding that the mere possibility that a few random revelations by individuals associated with the defendants can somehow defeat class certification despite our owing great deference to the district court that decided otherwise, the panel majority gives putative illegal pyramid schemes a Teflon coating, protecting them not only from class actions but, as a practical matter, from any suits claiming fraud, whether civil RICO or otherwise. ■ One of the core reasons that class actions exist is to give large groups of minor players like the instant plaintiffs a way to have their claims heard in court. Because, by definition, none of the individual claims can ever amount to enough dollars to justify separate and individual litigation, the elimination of class actions in pyramid schemes insures their total immunity from otherwise viable civil claims.
For the foregoing reasons, I respectfully DISSENT.

. Any inference of reliance at the class certification stage is only that and nothing more: “the sole result of this inference is that the class members will not be required to testify as to their reliance on the [defendants’] misrepresentations and omissions.” CGC Holding Co. v. Broad & Cassel, 773 F.3d 1076, 1093 (10th Cir.2014). The "inference does not shift the burden of proof at trial on the element of RICO causation (or any other elements of the claim) — plaintiffs will still have to prove RICO causation by a preponderance of the evidence to win on the merits.” Id. "Similarly, the trier of fact is not required to accept the inference; it is merely permitted to utilize it as common evidence to establish the class’s prima facie claims under RICO.” Id.

. Reyes v. Netdeposit, LLC, 802 F.3d 469, 491-92, 2015 WL 5131287, at *18 (3d Cir. Sept. 2, 2015) ("Class actions are often the only practical check against the kind of widespread mass-marketing scheme alleged here. The individual claims arising from such conduct are usually too small to justify suit unless aggregated in a class action. This is particularly true when, as is often the case, the scheme targets unsophisticated consumers with little disposable income and without the means or wherewithal to seek assistance of legal counsel. As a practical matter, the average victim of such a scheme nearly always finds it far easier — -and much cheaper — to reluctantly accept any loss and move on than to undertake the expense and inconvenience endemic in the protracted process of trying to recover a few dollars years later.”).

.At oral argument, the plaintiffs’ counsel represented that the average loss of each potential class member is $200 to $300.

. Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc., 482 F.3d 372, 380 (5th Cir.2007) (quoting Allison v. Citgo Petrol. Corp., 151 F.3d 402, 408 (5th Cir.1998)).

. Fed.R.Civ.P. 23(a).

. Fed.R.Civ.P. 23(b).

. Ahmad v. Old Republic Nat. Title Ins., 690 F.3d 698, 702 (5th Cir.2012) (citing Fed.R.Civ.P. 23(b)).

. Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011).

. Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 654, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008).

. Id. at 659, 661, 128 S.Ct. 2131 ("RICO’s text provides no basis for imposing a first-party reliance requirement.”).

. The defendants do not dispute this point, yet the majority notes that "it is not clear that all Plaintiffs were told that Ignite was a lawful business....” This statement ignores that the alleged misrepresentation — that Ignite is a lawful venture — is implied.

. Torres v. SGE Mgmt. LLC, No. 4:09-CV-2056, 2014 WL 129793, at *9 (S.D.Tex. Jan. 13, 2014).

.See CGC Holding Co., 773 F.3d at 1089-90 ("In the RICO context, class certification is proper when ‘causation can be established through an inference of reliance wherp the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct.' ") (quoting In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig., 277 F.R.D. 586, 603 (S.D.Cal.2011)); In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 120 (2d Cir.2013) (“In cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed.”); Klay v. Humana, Inc., 382 F.3d 1241, 1259 (11th Cir.2004) ("It does not strain credulity to conclude that each plaintiff, in entering into con *162 tracts with the defendants, relied upon the defendants' representations [of legitimacy] and assumed they would be paid the amount they were due.”); see also Cohen v. Trump, 303 F.R.D. 376, 385 (S.D.Cal.2014) ("Courts have found that reliance can be established on a class-wide basis where the behavior of plaintiffs and class members cannot be explained in any way other than reliance upon the defendant’s conduct.”); Negrete v. Allianz Life Ins. Co. of N. Am., 287 F.R.D. 590, 611—12 (C.D.Cal.2012) ("That Allianz annuities are allegedly inferior in value and performance to comparable investment products ... gives rise to an inference that consumers decided to purchase the 'inferior' annuities because of the standardized marketing materials at issue in this litigation, for they otherwise had no reason to do so.”); Minter v. Wells Fargo Bank, N.A., 274 F.R.D. 525, 546 (D.Md.2011) ("[I]t is reasonable to infer that plaintiff class members would not have transacted with Prosperity had they known Prosperity was not a legitimate lender....”); Robinson v. Fountainhead Title Grp. Corp., 257 F.R.D. 92, 95 (D.Md.2009) ("[I]t would be a reasonable inference to assume that a class member who purchased services from Assurance Title relied on the legitimacy of that organization in paying the rate charged.”); Chisolm v. Tran-South Fin. Corp., 194 F.R.D. 538, 561 (E.D.Va.2000) ("[Plaintiffs] clearly made payments in reliance upon the assurance that the process of repossession, sale and all subsequent steps were taken in conformity with the law and that their rights were protected. To conclude otherwise would deny human nature, run counter to the traditional presumption in favor of actors operating under rational economic choice, and leave the Court with an absurd conclusion.”); Belinda Peterson v. H & R Block Tax Servs., Inc., 174 F.R.D. 78, 84-85 (N.D.Ill.1997) ("It is inconceivable that the class members would rationally choose to pay a fee for a service they knew was unavailable .... The only logical explanation for such behavior is that the class members relied on the RAL Fact Sheet's representation that they could take advantage of RAL by paying the requisite fee.”).

. Minter, 274 F.R.D. at 546.

. 773 F.3d at 1080.

. Id. at 1081.

. Id. at 1081, 1091-92 ("More specifically the fact that a class member paid the nonrefundable up-front fee in exchange for the loan commitment constitutes circumstantial proof of reliance on the misrepresentations and omissions regarding Hutchens’s past and the defendant entities’ ability or intent to actually fund the promised loan.”).

. 729 F.3d at 120.

. Id. (quoting Klay, 382 F.3d at 1259).

. 382 F.3d at 1246.

. Id. at 1259.

. Id.

. In re Koscot Interplanetary, Inc., 86 F.T.C. 1106, 1181 (1975).

. Indeed, as the defendants note, many, presumably legal, multi-level marketing programs such as Mary Kay, Tupperware, Amway, and Avon use this approach. See United States v. Gold Unlimited, Inc., 177 F.3d 472, 479-80 (6th Cir.1999) (“Some structures pose less risk of harm to investors and the public, however, and authorities permit these programs to operate even though the programs contain some elements of a pyramid scheme.’’).

. Webster v. Omnitrition Intern., Inc., 79 F.3d 776, 781 (9th Cir.1996).

. Gold Unlimited, 177 F.3d at 475 (emphasis added).

. Kugler v. Koscot Interplanetary, Inc., 120 N.J.Super. 216, 293 A.2d 682, 690 (Ch.Div.1972).

. Webster, 79 F.3d at 788 (citation and quotation marks omitted).

. See id. at 783 (citing In re Amway Corp., 93 F.T.C. 618 (1979)).

. At least one iteration of Ignite's “Independent Associate Terms & Conditions” required participants to assent to the following acknowledgment:
I understand that I will not receive any compensation whatsoever for the act of sponsoring or recruiting, and that I will only be compensated for selling Stream Energy products and services to customers and based upon activities of other IAs only to the extent of sales of Stream Energy products and services to customers.
(Underlining in original.) In its briefing, the defendants again confirm this point: "The only way an IA can receive any compensation is to sell energy to customers. Stream Energy pays zero compensation solely for recruiting.” (Emphasis in original.)

. Recently, the Third Circuit recognized and avoided a similar problem to the one the majority now creates. In Reyes, 802 F.3d at 474-75, 2015 WL 5131287, at *1, the plaintiffs sought certification on a RICO sham-enterprise theory, alleging that telemarketing firms contacted unsuspecting individuals and, in offering them something of little or no value, obtained bank account information later used to make unauthorized debits from the individuals' bank accounts. Recognizing the class members’ sham theory of liability, the district court found that the class members failed to satisfy Rule 23(b)(3)’s predominance requirement “because different sales pitches were used and different products were pitched.” Id. at 491, 2015 WL 5131287 at *17. The Third Circuit rejected this analysis, holding:
if absolute conformity of conduct and harm were required for class certification, unscrupulous businesses could victimize consumers with impunity merely by tweaking the language in a telemarketing script or directing some (or all) of the telemarketers not to use a script at all but to simply orally convey a general theme designed to get access to personal information such as account numbers.
Id. The court recognized further:
although such subtle but irrelevant variations in the manner of defrauding members of the public would not insulate unscrupulous marketers from liability in individual suits, it would' — for all practical purposes'— insulate them from class actions. An interpretation of Rule 23 that places class actions beyond the reach of consumers who have been victimized by fraudulent schemers who are wise enough to adopt schemes with subtle (but meaningless) variations would' invite the kind of consumer fraud that ... is alleg[ed] here.
*166 Id. at 491, 2015 WL 5131287 at *18.

. 319 F.3d 205 (5th Cir.2003).

. Id. at 224.

. Id. at 220 (emphasis added).

. Id.

. See Torres, 2014 WL 129793, at *9 ("[I]t can rationally be assumed (at least without any contravening evidence) that the legality of the Ignite program was a bedrock assumption of every class member....” (emphasis added)). Other courts have distinguished Sandwich Chef on the same basis. See, e.g., In re U.S. Foodservice, 729 F.3d at 120 (distinguishing Sandwich Chef because “the record ... contained] no such individualized proof indicating knowledge or awareness of the fraud by any plaintiffs” (emphasis in original)).

.See Credit Suisse First Bos., 482 F.3d at 380 (We review a district court’s class certification decision "for abuse of discretion in recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation....” (quotation marks omitted)).

. In re U.S. Foodservice, 729 F.3d at 122; see also Pub. Emps.’ Ret. Sys. of Miss. v. Merrill Lynch & Co., 277 F.R.D. 97, 118-19 (S.D.N.Y.2011) ("Sheer conjecture that class members ‘must have' discovered [the misrepresentations] is insufficient to defeat Plaintiff's showing of predominance when there is no admissible evidence to support Defendant’s assertions.”).

. Spectators’ Commc’n Network Inc. v. Colonial Country Club, 253 F.3d 215, 220 (5th Cir.2001).

.See, e.g., N.Y. Penal Law § 225.00(2) (“A person engages in gambling when he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome.”); Id. § 225.00(1) (defining the term "contest of chance” as “any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein”).

. See Poulos v. Caesars World, Inc., 379 F.3d 654, 665-66 (9th Cir.2004) ("[G]ambling is not a context in which we can assume that potential class members are always similarly situated. Gamblers do not share a common universe of knowledge and expectations.”); McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 225 (2d Cir.2008) ("[E]ach plaintiff in this case could have elected to purchase light cigarettes for any number of reasons, including a preference for the taste and a feeling that smoking Lights was 'cool.' ”).

. Poulos, 379 F.3d at 659-60.

. Id. at 665-66.

. Id.

. See CGC Holding Co., 773 F.3d at 1092 ("Unlike entering into a serious financial transaction, many people gamble without any consideration, let alone reliance, on the representations about the likelihood of striking it rich. Nor does every slot player spend any serious money expecting something (other than a good time, perhaps) in return.”); McLaughlin, 522 F.3d at 225 n. 7 (distinguishing the choice to enter a financial transaction from making a consumer purchase because "a financial transaction does not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase”); Cohen, 303 F.R.D. at 386 ("[UJnlike gambling, purchasing real estate seminars is not the type of consumer activity that is susceptible to wide-ranging behavioral rationales.”).